J-S06017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.T.R.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.S., FATHER | No. 2867 EDA 2016 |

Appeal from the Order entered August 10, 2016,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): AP#: CP-51-AP-0000389-2016,
DP#: CP-51-DP-0001748-2014, & FID# 51-FN-002353-2011.

BEFORE: MOULTON, RANSOM, and FITZGERALD,* JJ.

MEMORANDUM BY RANSOM:                                    **FILED MAY 08, 2017**

J.S. ("Father") challenges the order granting the petition filed by the Philadelphia Department of Human Services ("DHS") involuntarily terminating his parental rights to his daughter, S.T.R.R. ("Child") (born March 2014), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a) and (b). We affirm.

The trial court summarized the pertinent facts and procedural history as follows:

> The family in this case has been known to DHS since 2011. F.R. ("Mother") Child's mother, had tested positive for drugs at the birth of two of her children. [In March 2014] DHS received a General Protection Services report that Mother had tested positive for marijuana and PCP at the birth of Child. DHS put a Safety Plan in place stipulating that Child and Mother were not to

*Former Justice specially assigned to the Superior Court.

be left alone unsupervised.  DHS subsequently received reports that Mother was indeed left with Child unsupervised, and that Mother drove while high on PCP with Child in the car.  On July 22, 2014, DHS learned that Father was permitting Mother to be with Child unsupervised, and that Mother continued to use drugs.  That same day DHS obtained an Order of Protective Custody and placed Child in a foster home.  On August 1, 2014, the court adjudicated Child dependent and fully committed her to DHS custody.  The case was transferred to a Community Umbrella Organization [sic] ("CUA") which developed a Single Case Plan ("SCP") with objectives for Mother and Father.  Over the course of 2014 and 2015, Father became fully compliant with his objectives, and received unsupervised visitation with Child, with the understanding that Mother was not to be left alone with Child.  Believing that reunification with Father had been approved by the trial court and all parties, CUA mistakenly reunified Child with Father on January 9, 2016, and implemented supervision.  During the time Child was unified with Father, Father permitted Mother to be alone with Child unsupervised.  CUA discovered that reunification had not been approved, and Child was removed and placed in foster care.  On April 28, 2016, DHS filed a petition to terminate Father's parental rights to Child and change her permanency goal to adoption.

Trial Court Opinion, 9/21/16, at 1-2.

The trial court held an evidentiary hearing, at which the CUA case manager for the family, as well as Mother and Father testified.  The court summarized the testimony presented with regard to Father as follows:

At trial, the CUA case manager testified that Child came into care because of Mother's drug use.  Mother and Father lived together when Child came into care.  Father has had the same objectives for the life of the case, and has had them explained to him at several meetings.  Father's SCP objectives are to attend Child's medical appointments, obtain appropriate housing, take domestic violence classes, and attend weekly supervised visits with Child.  Father completed the domestic violence classes successfully and has appropriate housing.  Father is consistent with his visits, and interacts positively with Child.  In the past Father has been given unsupervised visits, then Child had been erroneously reunified with Father.  During this reunification,

- 2 -

Father left Child unsupervised with Mother, against court orders and in violation of the Safety Plan. Mother appeared to be high on drugs during that time. The CUA case manager testified that she no longer trusts Father to keep Child and Mother apart, since he violated the Safety Plan. The CUA case manager also testified that Father claims Mother lives elsewhere, but is not able to confirm that they live apart. Since Child's reunification and subsequent removal, Father has consistently attended visits, but Father does not act in a fatherly manner. Child does not consider Father to be her dad. Child did not exhibit a bond with Father when she was removed. The CUA case manager testified that Mother and Father lived apart when Father violated the Safety Plan, but now were living together again. Child is placed with her aunt and uncle ("Foster Parents") and considers them her mom and dad. Child is very closely bonded with the Foster Parents, and has lived with them for two years. The CUA case manager testified that it would be in Child's best interest to remain with the Foster Parents and be adopted by them. Father testified that if he was reunified with Child, Mother would go live somewhere else. Father also testified that he had another residence in Abington where he intended to live, and where he was successfully parenting other children. Father testified that he still has a bond with Child, who screamed when she was removed from his care. On cross-examination by the Child Advocate, Father testified that CUA had already ruled out the Abington residence as inappropriate for reunification with Child. Mother testified that she lives with Father, but would move out if reunification was likely.

Trial Court Opinion, 9/21/16 , at 2-3 (citations omitted).

Upon hearing the above testimony, and the arguments of counsel, the trial court made the following conclusions regarding Father:

We'll find reasonable efforts. [Child] is currently with the maternal aunt and uncle. [She's] doing well in the home - - it's through Wordsworth.

As to the parents, back in November 6th, 2015, the Court - - I think we actually had a pretty long hearing - - permanency review hearing, were the court had given [Father] unsupervised visits and made the some conditions to put [Father] in a position

- 3 -

to reunify with [Child], also by agreement of the child advocate, okay?

Subsequently, [Father] was given that opportunity to reunify with [Child], even though the child advocate had not agreed to it.

And, in that case, once DHS found out the error that there was no agreement and there was no court approval, the case was relisted for - - and we - - again, we had a pretty long permanency hearing on 1/29/2016.

By that time, CUA had already gone to [Father's] home retrieved [Child] and [Child] was in care. And, at that point, after that hearing on 1/29/2016, there was extensive testimony.

Witnesses testified that there was a violation of the safety plan by [Father], and [Father] was well aware of what the safety plan was and what the conditions were, because [Father's] always been here.

As far as I know, he's always been in here in court. He's never missed any day that I'm aware of. And, for that matter, I believe [Mother] has always been here too, so they're well aware of what's been done and what's been said in the courtroom.

I find that CUA is credible. Now, as to the bond, the Court finds - - I believe the parents, I'm sure, love [Child] enjoy being with [Child] but being a parent is also assuming the responsibility to develop a real bond.

And often, children, even if they're not placed with their parents, are still going to love their parents, and sometimes even have an enjoyable time with parents, but that doesn't mean that the parents have the ability to parent that child.

\*\*\*

As far as [Father], [he] completed most objectives.

Yes, he did go to parenting, he went to domestic violence. Again, I'm not sure how to convince [Father] that the most important thing is the ability of a parent to keep a child safe.

And [Father] was well aware. At two different hearings, he was given unsupervised visits. On January the 6th, 2015, a safety plan was put in place by CUA. Irrespective of CUA not

having the agreement of the child advocate, [Father] was given a great opportunity to show that he had the ability to parent.

And what happened on the 29th of January at a hearing? Testimony was heard by this Court that indicated [Father's] priority was not [Child], because he allowed [Mother] contact without being supervised by the agency.

So, the visits went back to supervised, and [Child] stayed in care. The Court also heard testimony that - - so, [Father] is fully compliant, but the ability not only to be physical [sic] compliant is - - it's not only the ability to be physically compliant with the objectives, but it is his inability to make and have the parent ability to keep [Child] safe.

So, as to both parents, the Court finds there's clear and convincing evidence to terminate their rights under 2511 Section - - Subsection (1) and (8), and Subsection (b). There would be no irreparable harm done to [Child].

The ability for bond cannot be in one direction only. It's a two-way street. It's a two direction - - that a child to be - - it's a child to a parent and parent to child.

The parents must exhibit the ability to be able to keep the child safe and make the right decisions and learn appropriately from the classes they have taken, such as parenting, domestic violence classes, and the willingness to be able to make the right decision in order to keep a child safe.

The Court finds there would be no irreparable harm done to [Child], since there is no parent-child bond, and it would be in the best interest to change to goal to adoption. Therefore, the goal is changed to adoption.

N.T., 8/9/16, at 110-115.[1] Father filed this timely appeal. Both the Father and the trial court have complied with Pa.R.A.P. 1925.

_____

[1] Mother has not filed an appeal. In his appeal, Father does not challenge the goal change.

Father raises the following issues on appeal:

1. Whether the trial court erred by terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. sec. 2511(a)(1) without clear and convincing evidence of [Father's] intent to relinquish his parental claim or refusal to perform his parental duties.

2. Whether the trial court erred by terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. sec. 2511(a)(8) without clear and convincing evidence that the conditions that led to the removal or placement of [Child] continue to exist and termination of parental rights would best serve the needs and welfare of [Child].

3. Whether the trial court erred by terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. sec. 2511(b) without clear and convincing evidence that there is no parental bond between [Father and Child] and that termination would serve the best interest of [Child].

Father's Brief at 7.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* We may reverse a decision based on an abuse of discretion only upon demonstration of "manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* We may not reverse, however, merely because the record would support a different result." *Id.* at 827.

We give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *In re T.S.M.*, 71

A.3d 251, 267 (Pa. 2013). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). In addition, in order to affirm the termination of parental rights, this Court need only agree with any one subsection under Section 2511(a). *See In re B.L.W.* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citations omitted).

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that for six months, the parent demonstrated a settled intent to relinquish a parental claim or a refusal or failure to perform parental duties:

> a)  The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition has evidenced a settled purpose of

> relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). This Court has interpreted this provision as requiring the Petitioner to demonstrate a settled intent to relinquish a parental claim to a child or a refusal or failure to parent:

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted).

This Court has defined "parental duties" in general as the obligation to affirmatively and consistently provide safety, security and stability for the child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty … requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.*

Moreover, a parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent child relationship:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted). Most importantly, "parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with her physical and emotional needs." *Id.*

In the instant case, the trial court properly concluded that DHS presented clear and convincing evidence to support the termination of Father's parental rights under Section 2511(a)(1). The court reasoned:

> The petition for involuntary termination was filed on April 28, 2016. During the six-month period prior to the filing of the petition, Father became fully compliant with all of his SCP objectives. The sole issue in this case is that Father permitted Mother to see Child alone and unsupervised, in violation of court orders and the Safety Plan. Father has been present at court hearings and SCP meetings. CUA and the trial court have explained to Father that he is not permitted to leave Child alone with Mother. However, in January 2016, Father did leave Child alone with Mother. During the time Mother was unsupervised with Child, Mother appeared to be under the influence of drugs, which has been Mother's main issue during the life of this case. Mother did not live with Father during that time, but has since moved in with him again. Father and Mother both testified that Mother could easily move out if reunification was offered again. However, the CUA case manager was unable to verify whether Mother and Father live apart. Father testified that he intended to move out of the appropriate housing he currently shared with Mother, into a house in Abington that CUA had deemed

inappropriate for reunification. When questioned on why he sought to move to an inappropriate house, Father testified that [his] other child and that child's mother live in the Abington residence. The other child's mother had lost custody of the other child, but was now compliant with her requirements. Because Father permitted Mother to be with Child unsupervised, the CUA case manager testified that she does not trust Father to keep them separated. Father has always known that Mother cannot be left unsupervised with Child. Between January 9 and 19 2016, Father had been erroneously reunified, without Child Advocate and court approval, with Child and was responsible to keep her safe. Mother did not even live with Father at the time, but he still allowed Mother to see Child unsupervised. Father was aware, and intentionally violated the Safety Plan. Subsequently, Father even allowed Mother to move into his home. The CUA case manager testified credibly that Father cannot be trusted to keep Child away from Mother. Father denied allowing Mother any unsupervised contact. In permitting Mother to have unsupervised contact, Father has failed to perform his parental duties. His actions since that failure have been to start living with Mother while planning to move Child to an inappropriate house in order to live with his other child. Father prioritizes the needs of Mother over the safety of Child.

Trial Court Opinion, 9/21/16, at 4-5 (citations omitted).

Father argues that he has fully complied with all of his goals and SCP objectives. According to Father, he "has never failed or refused to perform his parental duties, nor has he indicated a settled intent to relinquish his parental rights." *Id.* Additionally, Father asserts that he has "always disputed" the claim that he has permitted Mother unsupervised contact with Mother "and has never had the opportunity to examine the veracity of the hearsay evidence" on which this claim is based. *Id.* Finally, Father asserts that "violation of a safety plan does not constitute a settled intent to

relinquish a parental claim nor does it constitute a refusal or failure to perform parental duties." Father's Brief at 11. We disagree.

Our review of the record supports the trial court's conclusions regarding Father's priorities and that the failure to keep a child safe is a failure to perform parental duties. *See* Trial Court's Opinion, 9/21/16 at 5. It was for the trial court, as a matter of credibility, to determine the weight to be given Father's testimony vis-à-vis the testimony of the CUA case manager. *In re M.G.*, *supra*.

Moreover, although Father claims that pertinent testimony presented at a January 29, 2016 permanency review hearing regarding the safety plan violation was based on hearsay, the lack of transcript of that hearing in the certified record prevents this Court from further review. *See Smith v. Smith*, 637 A.2d 622, 623-624 (Pa. Super. 1993) (explaining that appellant's failure to insure that the original record contains sufficient information to conduct proper appellate review constitutes waiver of issue sought to be examined). We do note, however, that Child's maternal aunt was present for the hearing, and, according to the trial court, testified as a witness. *See* Permanency Review Order, 1/29/16; N.T. 8/9/16, at 64-65; *see also* N.T. 8/9/16, at 1113 (trial court states that foster parent testified to observation of Mother's unsupervised contact with Child while in Father's custody).

Accordingly, the court did not abuse its discretion in terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), and we need

- 11 -

not consider the other basis for termination under this section. ***See B.L.W.,***
***supra***.

We next turn to Father's assertion that DHS did not meet its burden of proof with regard to Section 2511(b). Father testified that he and Child have a strong emotional bond, as demonstrated by her behavior when she was taken from him in January 2016. According to Father, he has "offered an environment for [Child] to thrive and bond with her sibling." Father's Brief at 13. Finally, Father asserts that the "failure of the caseworker and the [DHS] to make reasonable efforts toward full and proper reunification interfered with [his] ability to further strengthen his emotional bond with [Child]." ***Id.***

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." ***In re: Adoption of J.M.,*** 991 A.2d 321, 324 (Pa. Super. 2010).

In ***In re C.M.S.,*** 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court found that "intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***Id.*** In cases where there is no evidence of a bond

between a parent and a child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Thus, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

Once again, the weight to be afforded Father's testimony, as well as the efforts made by DHS and CUA at reunification, was a matter of credibility exclusively within the province of the trial court as fact finder. *In re M.G.*, *supra*. Given its credibility determinations, the trial court explained:

> Throughout the life of this case, Father has consistently visited with Child. However, since Child's erroneous reunification and subsequent placement, Father has not behaved in a fatherly manner at visits. The CUA case manager testified credibly that Child and Father do not have a parent/child bond. Child is able to separate from Father at visits without crying. When Child was removed from Father after reunification, half-asleep in the middle of the night, she was upset. However, the CUA social worker testified that she did not exhibit a bond with Father. Father's own testimony is that he intends to move out of the county to the Abington residence, which he knows is inappropriate for Child. Father testified that he still intends to do this because it will permit him to live with his other child and that child's mother. Father testified that he did this so that the other child could remain in his current school. This demonstrated to the trial court that while Father cares for his other child, he placed the needs of that child above the needs and safety of this Child. Child has lived with Foster Parents for two years and is closely bonded with them. Child considers Foster Parents her mom and dad. They were able to calm Child when she was removed from Father. It would be in Child's best interest for Father's parental rights to be terminated, so that Foster Parents could adopt her. Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive, beneficial parent-child [] bond with Father, and that termination of Father's parental rights would not destroy an existing beneficial relationship.

- 13 -

Trial Court Opinion, 9/21/16, at 7 (citation omitted).

Our review of the record supports the trial court's conclusion regarding the extent of a parental bond between Father and Child. Accordingly, we conclude that DHS presented clear and convincing evidence that termination of Father's parental rights were in Child's best interests.

In sum, our review of the record supports the trial court's order concluding that that DHS met its statutory burden of proving by clear and convincing evidence that Father's parental rights should be terminated pursuant to 23 Pa.C.S. §§ 2511(a)(1) and 2511(b). Accordingly, we affirm.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2017